## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| AMY G.,[1] | : | Case No. 2:24-cv-01151 |
| Plaintiff, | : | |
| | : | District Judge Algenon L. Marbley |
| | : | Magistrate Judge Caroline H. Gentry |
| vs. | : | |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION[2]

Plaintiff filed an application for Disability Insurance Benefits in January 2022.

Plaintiff's claim was denied initially and upon reconsideration. After a hearing at

Plaintiff's request, the Administrative Law Judge (ALJ) concluded that Plaintiff was not

eligible for benefits because she was not under a "disability" as defined in the Social

Security Act. The Appeals Council denied Plaintiff's request for review. Plaintiff

subsequently filed this action.

Plaintiff seeks an order remanding this matter to the Commissioner for the award

of benefits or, in the alternative, for further proceedings. The Commissioner asks the

Court to affirm the non-disability decision. For the reasons set forth below, the

---

[1] See S.D. Ohio General Order 22-01 ("The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that due to significant privacy concerns in social security cases federal courts should refer to claimants only by their first names and last initials.").

[2] See 28 U.S.C. § 636(b)(1). The notice at the end of this opinion informs the parties of their ability to file objections to this Report and Recommendation within the specified time period.

undersigned Magistrate Judge **RECOMMENDS** that the Commissioner's decision be

**AFFIRMED**.

## I.    BACKGROUND

Plaintiff asserts that she has been under a disability since September 9, 2020.[3] At

that time, she was forty-eight years old. Accordingly, Plaintiff was considered a "younger

person" under the Social Security regulations. 20 C.F.R. § 404.1563(c). Plaintiff has a

"high school education and above." 20 C.F.R. § 404.1564(b)(4).

The evidence in the Administrative Record ("AR," Doc. No. 7) is summarized in

the ALJ's decision ("Decision," Doc. No. 7-2 at PageID 38-68), Plaintiff's Statement of

Errors ("SE," Doc. No. 8), the Commissioner's Memorandum in Opposition ("Mem. In

Opp.," Doc. No. 9), and Plaintiff's Reply Memorandum ("Reply," Doc. No. 10). Rather

than repeat these summaries, the Court will discuss the pertinent evidence in its analysis

below.

## II.    STANDARD OF REVIEW

The Social Security Administration provides Disability Insurance Benefits to

individuals who are under a "disability," among other eligibility requirements. *Bowen v.

City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 402, 423(a)(1), 1382(a).

The term "disability" means "the inability to do any substantial gainful activity by reason

of any medically determinable physical or mental impairment which . . . has lasted or can

---

[3] Plaintiff initially alleged that her disability began on October 15, 2015. (AR, Doc. No. 7-5 at PageID 485.) She thereafter amended her alleged disability onset date to September 9, 2020. (AR, Doc. No. 7-6 at PageID 561.)

be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

This Court's review of an ALJ's unfavorable decision is limited to two inquiries: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). "Unless the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence," this Court must affirm the ALJ's decision. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). Thus, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Id.*

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). This limited standard of review does not permit the Court to weigh the evidence and decide whether the preponderance of the evidence supports a different conclusion. Instead, the Court is confined to determining whether the ALJ's decision is supported by substantial evidence, which "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citation omitted). This standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v.*

3

*Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). Thus, the Court may be required to affirm the ALJ's decision even if substantial evidence in the record supports the opposite conclusion. *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.1997).

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Id.* (citations omitted). Such an error of law will require reversal even if "the outcome on remand is unlikely to be different." *Cardew v. Comm'r of Soc. Sec.*, 896 F.3d 742, 746 (6th Cir. 2018) (internal quotations and citations omitted).

## III.    FACTS

### A.    The ALJ's Factual Findings

The ALJ was tasked with evaluating the evidence related to Plaintiff's application for benefits. In doing so, the ALJ considered each of the five sequential steps set forth in the Social Security regulations. *See* 20 C.F.R. § 404.1520. The ALJ made the following findings of fact:

Step 1:    Plaintiff did not engage in substantial gainful activity during the period from her amended alleged disability onset date of September 9, 2020 through her date last insured of December 31, 2020.

Step 2:    She had the severe impairments of degenerative disc and joint disease of the spine with scoliosis, degenerative joint disease of the knee, osteoarthritis of the right hip, obesity, tachycardia, a

4

depressive disorder, an anxiety disorder with panic and social phobia, and a posttraumatic stress disorder (PTSD).

Step 3:     She did not have an impairment or combination of impairments that meet or equaled the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     Her residual functional capacity (RFC), or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consisted of the following limitations: "[She] had the residual functional capacity to lift/carry [twenty] pounds occasionally and [fifteen] pounds frequently. She could stand/walk [four] hours during an [eight]-hour workday and could sit up to [six] hours during an [eight]-hour workday. [Plaintiff] should avoid climbing ladders, ropes, and scaffolds and could occasionally climb ramps and stairs. She could occasionally balance, stoop, crouch, and kneel. She should avoid crawling. She should avoid work at unprotected heights and work around hazardous machinery. [Plaintiff] should avoid positions with requirements for commercial driving as part of routine job duties. [Plaintiff] should avoid bilateral operation of foot controls. [Plaintiff] should avoid concentrated exposure to vibration. She would require the medical necessary use of a cane for walking away from the work station but could use the contralateral arm for lifting/carrying the exertional weight limits. [Plaintiff] should avoid positions with regular communication with the general public as part of routine job duties but could tolerate occasional (as defined in the DOT) interaction with coworkers and supervisors regarding work[-]related communication. [Plaintiff] should avoid tandem work with coworkers. She could perform simple, routine work and could perform work of a variable rate, without fast-paced production, assembly line work or work where a machine sets the pace. She could work in a setting with end of day work goals versus strict hourly production rates. [Plaintiff] could tolerate occasional decision making and occasional changes in the work setting."

She was unable to perform any of her past relevant work.

Step 5:     Through the date last insured, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could have performed.

(Decision, Doc. No. 7-2 at PageID 46-63.) These findings led the ALJ to conclude that Plaintiff did not meet the definition of disability and so was not entitled to benefits. (*Id.* at PageID 63.)

**B.    Jeffrey Haggenjos, D.O.**

Primary care physician Dr. Haggenjos completed a Treating Primary Care Provider Statement form in August 2022. (AR, Doc. No. 7-10 at PageID 2213-14.) Dr. Haggenjos listed the following diagnoses: "lumbar disc," radiculopathy, high blood pressure, GERD, sleep apnea, morbid obesity, insomnia, depression, and anxiety. (*Id.* at PageID 2213.) Dr. Haggenjos referred to a "poor" prognosis. (*Id.*) When asked to identify the clinical findings and objective signs that supported the severity of Plaintiff's symptoms and his opinions, Dr. Haggenjos wrote: "1) see psych report[;] 2) abnormal lumbar . . . [illegible][;] 3) confusion/. . . [illegible][; and] 4) dyspnea[.]" (*Id.* at PageID 2213.) Dr. Haggenjos opined that Plaintiff: could stand and/or walk for less than a total of two hours in an eight-hour workday; could sit for at least six hours in an eight-hour workday; needed to shift positions at will from sitting, standing, walking, and lying down; needed to include periods of walking around; needed to take unscheduled breaks, each lasting for fifteen minutes, every hour; needed to use a cane or assistive device for standing and walking; would be off task for twenty-five percent or more of the workday; and would miss more than four days of work per month. (*Id.* at PageID 2213-14.) Dr. Haggenjos opined that Plaintiff's impairments were likely to produce "good days" and "bad days," but further opined that Plaintiff would experience "mostly bad days." (*Id.* at

PageID 2214.) Dr. Haggenjos also indicated that Plaintiff's symptoms and limitations began in 2015. (*Id.*)

The ALJ concluded that Dr. Haggenjos' opinions were "generally less persuasive." (Decision, Doc. No. 7-2 at PageID 60.) The ALJ explained that he did not adopt Dr. Haggenjos' proffered limitations because they were "more restrictive than the treatment notes of record during the period document[ed]." (*Id.*) The ALJ explained:

> While [Plaintiff] experienced some tachycardia, it appears the condition existed longitudinally and was no more than intermittent. [Plaintiff] required no significant treatment for the condition during the period under consideration and was not routinely treating with a cardiologist. [Plaintiff] did not require emergent treatment on a routine basis for symptoms such as shortness of breath with irregular cardiac rate. While obese, [Plaintiff] was not receiving any medication management and there was no discussion of any formal treatment for her body habitus. Further, she did not report her body habitus caused any specific work-related limitations. [Plaintiff] evidenced some scoliosis and spinal degeneration, but there was no invasive treatment during the period under adjudication. There was no discussion of invasive surgical intervention and [Plaintiff] was not treating with pain management. There was no noted spinal instability and no nerve conduction testing that [Plaintiff's] back symptoms affected the upper or lower extremities. [Plaintiff] was noted to have right hip osteoarthritis; however, there was no noted hip instability observed in the record. [Plaintiff] exhibited left knee degeneration, but [Plaintiff] showed no knee instability. Both joint conditions were treated conservatively. [Plaintiff] was not in pain management and required no more than some injection therapy. [Plaintiff] showed generally intact strength and sensation. There were no reports of falls or fall related injuries. [Plaintiff] required no bracing. [Plaintiff] showed no atrophy or deconditioning. The undersigned finds the physical limitations were more restrictive than the generally normal examination findings and the relatively stable objective imaging.

(*Id.*)

The ALJ then addressed a few of the limitations suggested by Dr. Haggenjos. (AR, Doc. No. 7-2 at PageID 60.) The ALJ discounted the off-task limitation because it was

7

"greater than the record supported given [Plaintiff's] pain was treated no more than conservatively during the period under consideration." (*Id.*) He explained that Plaintiff "was not involved in pain management therapy and was taking mainly over[-]the[-]counter analgesics with intermittent joint injections during the relevant period." (*Id.*) Conversely, the ALJ found that the limitation regarding use of a cane was "generally consistent with the prescribed cane in April 2020 prior to the period under consideration and [Plaintiff's] testimony that she continued to use the device." (*Id.*) As for Dr. Haggenjos' opinion regarding absenteeism, the ALJ concluded that the limitation was "inconsistent with the record." (*Id.*) He reasoned: "[Plaintiff] was not involved in any treatment modality that required a recovery period. She was not receiving recurrent emergent treatment nor was she hospitalized for any extended duration for her physical conditions." (*Id.*)

### C. Sharon Lyon-Paul, C.N.P.

Nurse Lyon-Paul provided mental health pharmacological management services to Plaintiff at Allwell Behavioral Health Services beginning in September 2020. (AR, Doc. No. 7-10 at PageID 1869-70.) Nurse Lyon-Paul completed a mental capacities assessment checkbox form in September 2022. (AR, Doc. No. 7-11 at PageID 2822-23.) Nurse Lyon-Paul checked boxes to indicate her opinions that Plaintiff had "[n]o useful ability to function" (defined as "extreme limitation . . . cannot perform this activity on a routine, reliable[,] and sustained schedule in a regular work setting") in the following mental abilities and aptitudes needed to perform unskilled work: completing a normal workday and workweek without interruptions from psychologically-based symptoms;

8

accepting instructions and responding appropriately to criticism from supervisors; and getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes. (*Id.* at PageID 2822.) Nurse Lyon-Paul also checked boxes to indicate that Plaintiff was "[s]eriously limited" (defined as "noticeable difficulty . . . from [eleven] to [twenty] percent of the workday or work week") in the areas of maintaining attention for two-hour segments, maintaining regular attendance, being punctual within customary and usually-strict tolerances, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, performing at a consistent pace without an unreasonable number and length of rest periods, responding appropriately to changes in a routine work setting, and dealing with normal work stress. (*Id.*)

As for the mental abilities and aptitudes needed to perform semiskilled and skilled work, Nurse Lyon-Paul checked boxes to indicate that Plaintiff was "[u]nable to meet competitive standards" (defined as "noticeable difficulty . . . from [twenty-one] to [forty] percent of the workday or work week") in the areas of carrying out detailed instructions, setting realistic goals or making plans independently of others, and dealing with the stress of semiskilled and skilled work. (AR, Doc. No. 7-11 at PageID 2823.) Nurse Lyon-Paul indicated that Plaintiff was seriously limited in the ability to understand and remember detailed instructions. (*Id.*)

In the final area of "mental abilities and aptitudes needed to do particular types of jobs," Nurse Lyon-Paul checked boxes to indicate that Plaintiff was unable to meet competitive standards in interacting appropriately with the general public and using

public transportation. (AR, Doc. No. 7-11 at PageID 2823.) She indicated that Plaintiff was seriously limited in the abilities of maintaining socially appropriate behavior and traveling in unfamiliar places. (*Id.*) Nurse Lyon-Paul further opined that Plaintiff's impairments and treatment would cause her to be absent from work for more than four days per month. (*Id.*) She noted that Plaintiff's symptoms and limitations began in 2015. (*Id.*)

When asked to explain the limitations that she assessed regarding Plaintiff's difficulty with completing unskilled work, Nurse Lyon-Paul wrote: "Problems with interpersonal relationships, poor control of temper, anxiety, problems with accepting criticism, defensive, [and] 'can't focus.'" (AR, Doc. No. 7-11 at PageID 2822.) For the areas addressing Plaintiff's ability to perform semiskilled and skilled work, Nurse Lyon-Paul reasoned: "Problems managing emotions impacts [sic] ability to act independently under stress[.]" (*Id.* at PageID 2823.) Nurse Lyon-Paul explained the additional limitations assessed with the following rationale: "Anxiety attacks, anger outbursts, impatient[,] lose temper, walk off jobs . . . [illegible] attendance due to anxiety [and] depression." (*Id.*) Finally, Nurse Lyon-Paul commented: "She has had increasing difficulties with depression and anxiety over [the] last [ten] years." (*Id.*)

Although the ALJ did not adopt Nurse Lyon-Paul's functional limitations, he found her opinions "partially persuasive in that they support at least some limitation in each area of mental health functioning." (Decision, Doc. No. 7-2 at PageID 60.) The ALJ acknowledged that Plaintiff's "treatment record with reports [of] breakthrough mental symptomatology," combined with Plaintiff's reports of physical pain, supports some

10

limitations. (*Id.* at PageID 60-61.) However the ALJ stated that she did "not adop[t] the

severity of the limitations noted by [Nurse Lyon-Paul]" (*id.* at PageID 60), explaining:

> [T]he record supports [Plaintiff] was able to live independently and
> cohabitate with her husband during the relevant period (Exhibit B3E; B12F;
> Testimony). [Plaintiff] continued to drive, she could go out in public
> unaccompanied and to the store every couple of weeks (Exhibit B3E:
> Testimony). She was able to engage in generally normal/routine activities,
> could manage her funds, prepare simple meals, manage her medical care,
> and care for her pet dog (Exhibit B3E; B12F; Testimony). [Plaintiff] was
> capable of getting along with her medical providers and their staff. While
> the provider noted issues with focus, treatment notes documented intact
> concentration, attention, and memory (Exhibit B12F). While the form cited
> problems with temper and anger outbursts, the record does not support
> hostility, observed anger or aggression, and [Plaintiff] was not involved in
> anger management nor was there any indication of police involvement or
> involvement with other authorities due to anger/mental symptomology
> during the period under adjudication.

(*Id.* at PageID 61.)

The ALJ further explained that Nurse Lyon-Paul's opinion regarding absenteeism

was "inconsistent with the treatment notes of record":

> The record supported only conservative mental treatment with medications
> and counseling/therapy intervention. [Plaintiff] was not involved in mental
> health treatment with a recovery period nor did she require any recurrent
> emergent mental treatment for the acute exacerbation of mental
> symptoms/conditions. Further, there was no hospitalization for mental
> instability for any extended duration. While [Plaintiff] reported suicidal
> ideation, it should be noted at hearing, she admitted she felt these
> symptoms while she was working and did not have such active suicidal
> once she was in treatment (Testimony; Exhibit B12F).

(AR, Doc. No. 7-2 at PageID 61.) The ALJ concluded that Nurse Lyon-Paul's opinions

were "less persuasive as discussed herein, noting the condition/symptom severity is not

consistent with or supported by the provider's own treatment notes of record." (*Id.*)

11

## IV.    LAW AND ANALYSIS

Plaintiff asserts that the ALJ erred in her analysis of the medical opinions of Dr. Haggenjos and Nurse Lyon-Paul. (SE, Doc. No. 8 at PageID 3135-45.) For the reasons discussed below, the undersigned concludes these contentions are not well-taken and therefore **RECOMMENDS** that the ALJ's decision be affirmed.

### A.    Applicable Law.

ALJs are required to analyze the persuasiveness of "***all*** of the medical opinions" in the record. 20 C.F.R. § 404.1520c (emphasis added). A "medical opinion" is a "statement from a medical source about what [an individual] can still do despite [his] impairment(s)" and whether the individual has one or more impairment-related limitations or restrictions. 20 C.F.R. § 404.1513(a)(2). By contrast, a statement from a medical source about an issue reserved to the Commissioner—such as whether an individual is disabled—need not be addressed by the ALJ. 20 C.F.R. § 404.1520b(c)(3).

Because Plaintiff filed her claim after March 27, 2017, the new regulations for evaluating medical opinion evidence applied. Under these regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s) . . . ." 20 C.F.R. § 404.1520c(a). Instead, the ALJ must evaluate the persuasiveness of each medical opinion and prior administrative medical finding by considering the following factors: (1) supportability; (2) consistency; (3) relationship with the plaintiff; (4) specialization; and (5) any other factor "that tend[s] to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(c).

12

The first two factors—supportability and consistency—are the "most important." 20 C.F.R. § 404.1520c(b)(2) (emphasis added). The supportability factor recognizes that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). Therefore, an ALJ's supportability analysis addresses whether a medical professional has sufficient justification for their *own* conclusions. *See Crystal E.J. v. Comm'r of Soc. Sec.*, No. 2:21-CV-04861, 2022 WL 2680069 (S.D. Ohio July 12, 2022) (Preston Deavers, M.J.); *accord Burke v. O'Malley*, No. 8:23-cv-415, 2024 U.S. Dist. LEXIS 48944, *8 (M.D. Fla. Mar. 20, 2024) ("Supportability addresses the extent to which a medical source or consultant has articulated record evidence bolstering her own opinion or finding.").

The consistency factor, by contrast, recognizes that "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2). The ALJ's consistency analysis therefore must compare the medical opinion at issue to evidence from "*other* medical and nonmedical sources." *Ford v. Comm'r of Soc. Sec.*, No. 1:22-CV-00524, 2023 WL 2088157, at *17 (N.D. Ohio Jan. 31, 2023).

The distinction between the supportability and consistency factors is relatively clear when the opinion is from a treating provider. Providers commonly rely on the records in their possession—including progress notes, test results, statements from the claimant, and opinions from other medical providers—to support their medical opinions.

An ALJ can readily identify a provider's records that purportedly support their opinion and use them to analyze supportability. Then, when analyzing consistency, the ALJ can readily compare the provider's opinion to opinions and evidence from ***other*** providers. Because each factor (supportability and consistency) considers different evidence, the reviewing court can easily determine whether the ALJ has addressed each factor.

It can be more challenging to distinguish between supportability and consistency when the opinion is from a state agency consultant. Because they do not have their own treatment records, consultants must review and rely upon documents in the administrative record to support their opinions. The ALJ will, however, consider documents from the same administrative record when analyzing both supportability and consistency. If the consultant's report clearly identifies the documents relied upon to support their opinions, then the ALJ can conduct a supportability analysis that is based on those documents. But if the consultant's report does not clearly identify the documents that support their opinions, then the ALJ's ability to conduct separate supportability and consistency analyses will be limited. *See Kenneth B. v. Comm'r of Soc. Sec.*, No. 3:22-cv-672, 2024 U.S. Dist. LEXIS 49191 (W.D. Ky. Mar. 19, 2024) (citing *Tyrone H. v. Comm'r of Soc. Sec.*, No. 2:22-cv-3652, 2023 WL 2623571, *6 (S.D. Ohio Mar. 24, 2023) (Jolson, M.J.)).

Because they are the most important factors, the ALJ is required not only to consider the supportability and consistency of all medical opinions in the record, but also to "explain *how* he or she considered them."[4] *Dayna S. v. Comm'r of Soc. Sec.*, 3:21-CV-

---

[4] By contrast, the ALJ "may, but [is] not required to," explain the consideration given to the remaining factors. 20 C.F.R. § 404.1520c(b)(2).

00326, 2023 WL 2009135, at *5 (S.D. Ohio Feb. 15, 2023) (Gentry, M.J.) (citing to 20

C.F.R. § 404.1520c (b)(2) (internal punctuation omitted and emphasis added)). No

"specific level of detail" is required, as "the appropriate level of articulation will

necessarily depend on the unique circumstances of each claim." *Timothy B. v. Comm'r of

Soc. Sec.*, No. 2:22-CV-03834, 2023 WL 3764304, at *7 (S.D. Ohio June 1, 2023)

(Bowman, M.J.) (internal citations omitted). Thus, ALJs need not use "magic words or

any specific phrasing" to comply with the applicable regulations. *Id.*

Nevertheless, an ALJ is required "to show his or her work." *Scott K. v. Comm'r of

Soc. Sec.*, No. 3:21-CV-00129, 2022 WL 4484603, at *4 (S.D. Ohio Sept. 27, 2022)

(Silvain, M.J.) (internal citation omitted). Thus, "[t]his Court cannot uphold an ALJ's

decision, even if there if there is enough evidence in the record to support the decision,

where the reasons given by the trier of fact do not build an accurate and logical bridge

between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D.

Ohio 2011) (cleaned up) (internal quotations and citation omitted). *See also Danyel P. v.

Comm'r of Soc. Sec.*, No. 2:21-CV-02405, 2022 WL 1514170, at *6 (S.D. Ohio May 13,

2022) (Preston Deavers, M.J.) (ALJ's "inexplicable and illogical consistency" warranted

remand); *Kimberly S. v. Comm'r of Soc. Sec.*, No. 3:21-CV-00310, 2022 WL 17820565,

at *3 (S.D. Ohio Dec. 20, 2022) (Silvain, M.J.) (ALJs must "provide a coherent

explanation of [their] reasoning . . . in order to provide sufficient rationale for a reviewing

adjudicator or court"); *Hardiman v. Comm'r of Soc. Sec.*, No. 2:12-CV-00508, 2013 WL

3762266, at *5 (S.D. Ohio July 16, 2013) (Preston Deavers, M.J.) (remanding case on the

ground that "the ALJ's decision is internally inconsistent and incomplete").

**B.**     **The ALJ Did Not Reversibly Err In Evaluating The Opinions Of Dr. Haggenjos.**

Plaintiff's assertion that the ALJ did not properly evaluate Dr. Haggenjos' opinions is not well-taken. The ALJ complied with applicable regulations when she concluded that the opinions of Dr. Haggenjos were "generally less persuasive." (Decision, Doc. No. 7-2 at PageID 60.) The ALJ explained that she found that Dr. Haggenjos' opinions were "more restrictive than the treatment notes of record during the period document." (Decision, Doc. No. 7-2 at PageID 60.) This explanation addresses the supportability and consistency factors as required by 20 C.F.R. § 404.1520c(b)(2), and the ALJ's conclusions are supported by substantial evidence.

The ALJ addressed the consistency factor when she compared Dr. Haggenjos' opinions to the medical and other evidence. (Decision, Doc. No. 7-2 at PageID 60.) For instance, the ALJ acknowledged Plaintiff's diagnoses of right hip osteoarthritis and left knee degeneration. (*Id.*) She compared this to medical records that showed no hip or knee instability, "generally intact strength and sensation," no atrophy or deconditioning, and no reports of falls or fall-related injuries. (*Id.*) She also explained that Plaintiff did not participate in pain management treatment, "required no more than some injection therapy," and "required no bracing" during the period at issue. (*Id.*) The ALJ concluded: "The undersigned finds the physical limitations were more restrictive than the generally normal examination findings and the relatively stable objective imaging." (*Id.*)

The ALJ also addressed some of Dr. Haggenjos' specific opinions. She explained that she discounted Dr. Haggenjos' off-task limitation because it was "greater than the

16

record supported given [Plaintiff's] pain was treated no more than conservatively during the period under consideration." (Decision, Doc. No. 7-2 at PageID 60.) The ALJ also stated: "[Plaintiff] was not involved in pain management therapy and was taking mainly over[-]the[-]counter analgesics with intermittent joint injections during the relevant period." (*Id.*) Similarly, the ALJ discounted Dr. Haggenjos' absenteeism limitation because it was "inconsistent with the record." (*Id.*) The ALJ reasoned that Plaintiff was "not involved in any treatment modality that required a recovery period," "was not receiving recurrent emergent treatment," and was not "hospitalized for any extended duration for her physical conditions." (*Id.*) On the other hand, the ALJ concluded that Dr. Haggenjos' opinion regarding Plaintiff's need for the use of a cane was "generally consistent with the prescribed cane in April 2020 . . . and [Plaintiff's] testimony that she continued to use the device." (*Id.*) In all of these areas, the ALJ addressed the consistency of Dr. Haggenjos' opinions as required by 20 C.F.R. § 1520c(b)(2) and (c)(1), and her conclusions are supported by substantial evidence.

Plaintiff argues that the ALJ's analysis "entirely omits the supportability factor" because "[n]owhere in the discussion does the ALJ refer to the 'diagnostic techniques, data collection procedures/analysis, and other objective medical evidence' that Dr. Haggenjos utilized to reach his diagnoses." (SE, Doc. No. 8 at PageID 3137.) But the record contains no treatment notes from Dr. Haggenjos that are dated during the period at issue in this case.[5] Plaintiff's attorney informed the ALJ about this issue during the

---

[5] Dr. Haggenjos' treatment notes begin in February 2021. (*See* records from FHP Primary Care New Lexington, AR, Doc. No. 7-11 at PageID 2386-2708.)

February 2023 hearing, and the ALJ agreed to hold the record open for fourteen days after the hearing to give Plaintiff and her attorney time to obtain and submit those records. (AR, Doc. No. 7-2 at PageID 193-94, 213; *see also* Decision, Doc. No. 7-2 at PageID 41.) However, although Plaintiff submitted some additional medical records after the hearing, none of these records are dated during the relevant period. (*See* AR, Doc. No. 7-2 at PageID 69-186.) Therefore, the ALJ was unable to consider whether Dr. Haggenjos' opinions were supported by his treatment notes from the relevant period.

Nevertheless, the ALJ addressed the supportability factor because she addressed Dr. Haggenjos' supporting explanations. *See* 20 C.F.R. § 404.1520c(c)(1). As discussed above, Dr. Haggenjos listed several diagnoses on the assessment form. (AR, Doc. No. 7-10 at PageID 2213.) He also listed several of Plaintiff's symptoms and identified clinical findings and objective signs that allegedly supported the severity of Plaintiff's alleged symptoms. (*Id.*) With respect to Dr. Haggenjos' supporting explanations regarding morbid obesity (AR, Doc. No. 7-10 at PageID 2213), the ALJ reasoned that although Plaintiff was obese, she did not receive any medication and "there was no discussion of any formal treatment" for the condition. (Decision, Doc. No. 7-2 at PageID 60.)

As for Dr. Haggenjos' opinions regarding Plaintiff's lumbar spine condition, radiculopathy, and abnormal lumbar findings (AR, Doc. No. 7-10 at PageID 2213), the ALJ acknowledged that the record showed some evidence of scoliosis and spinal degeneration. (Decision, Doc. No. 7-2 at PageID 60.) She compared this evidence to the absence of other evidence: "[T]here was no invasive treatment during the period under adjudication. There was no discussion of invasive surgical intervention and [Plaintiff]

18

was not treating with pain management. There was no noted spinal instability and no nerve conduction testing that [Plaintiff's] back symptoms affected the upper or lower extremities." (*Id.*)

The ALJ also considered the supportability of Dr. Haggenjos' opinions regarding dyspnea (AR, Doc. No. 7-10 at PageID 2213), as follows:

> While [Plaintiff] experienced some tachycardia, it appears the condition existed longitudinally and was no more than intermittent. [Plaintiff] required no significant treatment for the condition during the period under consideration and was not routinely treating with a cardiologist. [Plaintiff] did not require emergent treatment on a routine basis for symptoms such as shortness of breath with irregular cardiac rate.

(Decision, Doc. No. 7-2 at PageID 60.)

In sum, the ALJ considered Plaintiff's diagnoses, Plaintiff's reported symptoms, and the clinical findings and objective signs that Dr. Haggenjos listed on the assessment form. The ALJ therefore considered the "supporting explanations" that Dr. Haggenjos presented to support his findings, which satisfies the supportability requirement. *See* 20 C.F.R. § 404.1520(c)(1). Also, the ALJ's supportability analysis accounted for other evidence in the record (or absent from the record) when considering Dr. Haggenjos' supporting explanations, and her conclusions are supported by substantial evidence.

Plaintiff further contends that the ALJ "excluded key evidence that vividly illustrated the severity of [Plaintiff's] back pain" when she "downplayed the severity of [Plaintiff's] back pain and scoliosis by finding that there was no discussion of surgical treatment nor involvement with pain management care during the relevant time period." (SE, Doc. No. 8 at PageID 3138.) According to Plaintiff, Dr. Haggenjos referred Plaintiff

to pain management after she complained of lumbar pain in March 2021, and provided another referral in May 2021 after Plaintiff was unable to establish care. (*Id.*) Plaintiff also cites June 2022 orthopedic notes that show she "was offered lumbar fusion as a remedy for her back issues," although "she elected not to undergo surgery." (*Id.*)

Plaintiff's contentions are not well-taken. As Defendant points out, although Dr. Haggenjos referred Plaintiff to pain management in March 2021, this treatment note—which documented Plaintiff's first complaints of back pain that radiated down the leg—is dated approximately three months after the date last insured. (AR, Doc. No. 7-11 at PageID 2427.) Plaintiff also told Dr. Haggenjos in May 2021 that she had experienced radicular pain "*since* March." (*Id.* at PageID 2481 (emphasis added).) And Plaintiff's June 2022 statement that refused Dr. Mullen's offer for a lumbar fusion procedure (AR, Doc. No. 7-11 at PageID 2885) was made long after Plaintiff's date last insured. The ALJ appropriately limited her consideration of Plaintiff's treatment history to the four-month period at issue in this case (i.e., September 9 to December 31, 2020), which preceded Plaintiff's complaints of radicular pain. Moreover, the ALJ considered Plaintiff's treatment history as only one factor in her consideration of Dr. Haggenjos' opinions. The ALJ's evaluation of Dr. Haggenjos' opinions is consistent with the applicable legal requirements and does not warrant reversal.

Plaintiff also argues that the ALJ erred by failing to provide citations to the record when analyzing Dr. Haggenjos' opinions, thereby preventing the Court from engaging in meaningful judicial review. (SE, Doc. No. 8 at PageID 3137.) This assertion is also not well-taken. Plaintiff did not cite to any regulation or rule that requires an ALJ to provide

20

citations to the record when evaluating medical opinion evidence, and the undersigned is aware of none. Moreover, the Court has been able to engage in meaningful review of the ALJ's analysis of Dr. Haggenjos' opinions. *Fleischer*, 774 F.Supp.2d at 877.

The Sixth Circuit Court of Appeals has not identified the level of articulation required for an ALJ to adequately explain her consideration of the supportability and consistency factors mandated by 20 C.F.R. § 404.1520c(b)(2). However, the Sixth Circuit has held that meaningful judicial review can be conducted even if the ALJ provided only a cursory or sparse analysis, so long as the ALJ made sufficient factual findings elsewhere in the decision that support her conclusion. *See Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (looking to findings elsewhere in the decision to affirm the ALJ's step three analysis, and finding no need for the ALJ to "spell out every fact a second time"); *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365-66 (6th Cir. 2014) (finding that the ALJ made "sufficient factual findings elsewhere in his decision to support his conclusion at step three). For example, in *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016), the ALJ did not err by explaining that a treating physician's opinion was "not consistent with the past treatment records" when analyzing the consistency factor. 660 F. App'x at 457. The Sixth Circuit reasoned that although the ALJ did not "reproduce the list of [the plaintiff's] treatment records a second time" to support this conclusion, "it suffices that she listed them elsewhere in her opinion." *Id.*

Here, the ALJ provided a detailed summary of the medical records related to Plaintiff's physical impairments earlier in the RFC analysis, and she included citations to the record. (Decision, Doc. No. 7-2 at PageID 50-54.) The ALJ also summarized the

medical records and Plaintiff's treatment for her physical complaints. (*Id.* at PageID 51-55.) This summary allows this Court to engage in a meaningful review of the ALJ's decision, and conclude that the ALJ's conclusions are supported by substantial evidence.

The ALJ acknowledged that Plaintiff's BMI in the treatment notes ranged from 39 to 41, which indicated obese to morbidly obese. (*Id.* at PageID 51 (citing AR, Doc. Nos. 7-9 at PageID 852, 870, 922, 971).) With respect to Plaintiff's right hip, left knee, and spine conditions, the ALJ cited a September 2020 left knee MRI that showed a small joint effusion and Baker's cyst, low-grade chondromalacia of the patella, and a lesion. (Decision, Doc. No. 7-2 at PageID 52 (citing AR, Doc. No. 7-9 at PageID 879).) The ALJ acknowledged that Plaintiff underwent several injections to the hip and knee joints which provided only short-term relief. (*Id.* at PageID 52-53 (citing AR, Doc. No. 7-9 at PageID 846, 848, 855, 873-74).) The ALJ noted that remote lumbar spine imaging showed minimal bulging and spondylosis but with no myelopathy or radiculopathy. (*Id.* at PageID 53 (citing AR, Doc. No. 7-9 at PageID 1002).) She stated that imaging in April and June of 2020 showed lumbar spondylosis and scoliosis, mild thoracic spondylotic changes, and mild osteopenia. (*Id.* (citing AR, Doc. No. 7-9 at PageID 864, 889).) The ALJ also acknowledged that lumbar spine imaging taken five to six months after the date last insured showed moderate scoliosis, mild to moderate lumbar spondylotic changes, and ongoing lumbar degenerative changes. (*Id.* (citing AR, Doc. No. 7-9 at PageID 885, 1109).)

The ALJ further cited many examination abnormalities such as tenderness to the medial joint line, discomfort over the medial and posterior aspects of the knee, some

palpable clicking of the knee, and lumbar spine tenderness. (Decision, Doc. No. 7-2 at PageID 51-53 (citing AR, Doc. No. 7-9 at PageID 840, 848, 854, 867, 871, 991-92).) The ALJ noted that Plaintiff's provider had prescribed a cane, which Plaintiff reported to be beneficial. (*Id.* at PageID 52.) The ALJ compared this evidence to many normal findings documented in the record, including no significant strength deficits in the extremities, intact sensation, no instability, stable varus and valgus testing, and normal patellar tracking. (*Id.* (citing AR, Doc. No. 7-9 at PageID 871, 991-92, 1159).)

The ALJ also summarized the medical records and Plaintiff's treatment related to tachycardia. The ALJ noted that a prior ALJ decision documented Plaintiff's treatment for intermittent and brief episodes of tachycardia that occurred "without other significant cardiac findings." (Decision, Doc. No. 7-2 at PageID 54 (citing AR, Doc. No. 7-3 at PageID 384).) The ALJ noted that records dated since that time showed no "objective resolution" of the condition, and that testing in June 2020 confirmed the presence of sinus tachycardia. (*Id.* (citing AR, Doc. No. 7-9 at PageID 914).) However the ALJ also noted that Plaintiff received "no invasive tachycardic treatment," and that the records showed "no associated dysthymia or other significant recurrent abnormal cardiac findings." (*Id.*)

The ALJ therefore relied on substantial evidence to support her conclusion that Dr. Haggenjos' opinions are not fully persuasive. Although the record does contains some objective and clinical medical findings that arguably provide support for Dr. Haggenjos' opinions, the ALJ acknowledged and evaluated these findings in her decision. The ALJ compared these findings to contradictory examination findings and objective testing in the record, and concluded that the balance of the evidence did not support Dr. Haggenjos'

23

opinions. Because  substantial evidence supports the ALJ's conclusion that Dr.

Haggenjos' opinions were not fully persuasive, reversal is not warranted.

### C.    The ALJ Did Not Reversibly Err In Evaluating The Opinions Of Nurse Lyon-Paul.

Similarly, Plaintiff's argument that the ALJ did not properly evaluate Nurse Lyon-

Paul's opinions is not well-taken. For the reasons discussed below, the ALJ complied

with the applicable regulations when she concluded that Nurse Lyon-Paul's opinions

were "less persuasive," and her conclusion is supported by substantial evidence.

The ALJ found that "[Plaintiff's] treatment record with reports [of] breakthrough

mental symptomology in combination of reports of physical pain supports some

limitation in each area of functioning." (Decision, Doc. No. 7-2 at PageID 60-61.)

Nevertheless, the ALJ did not adopt "the severity of the limitations" opined to by Nurse

Lyon-Paul, and explained the reasons for that decision. (*Id.* at PageID 61.) For example,

the ALJ explained that Plaintiff's daily activities did not support the extent of Nurse

Lyon-Paul's opinions, and cited several examples from Plaintiff's testimony, Plaintiff's

statements in a disability report, and the mental health treatment records. (*Id.* (citing

February 2023 Hearing Transcript, AR, Doc. No. 7-2 at PageID 187-214; Function

Report – Adult, AR, Doc. No. 7-6 at PageID 515-23; Records from Allwell Behavioral

Health, AR, Doc. No. 7-10 at PageID 1631-2145).) The cited evidence constitutes

substantial evidence that is adequate to support the ALJ's conclusions.

Next, the ALJ contrasted some of Nurse Lyon-Paul's proffered limitations with

evidence in the mental health treatment records. (Decision, Doc. No. 7-2 at PageID 61.)

For example, although Nurse Lyon-Paul opined that Plaintiff had trouble focusing, "treatment notes documented intact concentration, attention, and memory (Exhibit B12F)." (*Id.* (citing AR, Doc. No. 7-10 at PageID 1631-2145).) Regarding Nurse Lyon-Paul's references to Plaintiff's temper and anger outbursts, the ALJ stated that the record "does not support hostility, observed anger[,] or aggression." She also reasoned that Plaintiff was not involved in anger management, and that the record showed no police involvement due to anger issues. (*Id.*)

The ALJ similarly discounted Nurse Lyon-Paul's opinion regarding absenteeism because it was "inconsistent with the treatment notes of record." (*Id.*) She noted that Plaintiff's treatment history involved outpatient treatment "with medications and counseling/therapy intervention," and did not require "recurrent emergent treatment" or "hospitalization for mental instability for any extended duration." (*Id.*) The ALJ also noted that although Plaintiff reported suicidal ideation, she no longer experienced these symptoms once she was in treatment. (*Id.*) The ALJ concluded that Nurse Lyon-Paul's opinions were "less persuasive" because "the condition/symptom severity is not consistent with or supported by the provider's own treatment notes of record." (*Id.*) This explanation addresses both the supportability and consistency factors as required by 20 C.F.R. § 404.1520c(b)(2), and the ALJ's findings are supported by substantial evidence.

Plaintiff contends that the ALJ only compared Nurse Lyon-Paul's opinions to "other forms of evidence in the record" and did not address the supportability factor. (SE, Doc. No. 8 at PageID 3142.) This contention is not well-taken. The ALJ addressed several of Nurse Lyon-Paul's supporting explanations in her decision. *See* 20 C.F.R.

25

§ 404.1520c(c)(1). For example, when asked to explain her opined limitations in the area of performing unskilled work, Nurse Lyon-Paul wrote: "'Can't focus.'" (AR, Doc. No. 7-11 at PageID 2822.) The ALJ reasoned that "[w]hile the provider noted issues with focus, treatment notes documented intact concentration, attention, and memory (Exhibit B12F)." (Decision, Doc. No. 7-2 at PageID 61.) The ALJ also considered the supportability of Nurse Lyon-Paul's comment that Plaintiff experienced "poor control of temper" and "anger outbursts." (AR, Doc. No. 7-11 at PageID 2822-23.) Noting that "the form cited problems with temper and anger outbursts," the ALJ reasoned that the record did not show hostility or observed anger or aggression. (Decision, Doc. No. 7-2 at PageID 61.)

The ALJ also relied on mental health treatment notes to conclude that Plaintiff's activities and mental status examination findings did not fully support Nurse Lyon-Paul's opinions. (Decision, Doc. No. 7-2 at PageID 61 (citing Exhibit B12F, AR, Doc. No. 7-10 at PageID 1631-2145).) The ALJ provided a detailed summary of the medical records related to Plaintiff's mental impairments earlier in the RFC analysis, and summarized each of the medication management sessions with Nurse Lyon-Paul that occurred during the relevant time period. (Decision, Doc. No. 7-2 at PageID 55-57.) The ALJ summarized Plaintiff's subjective complaints during these visits, which included depression, crying spells, anxiety, panic, flashbacks, intrusive thoughts with avoidance, insomnia, low energy, and decreased concentration. (*Id.* (citing AR, Doc. No. 7-10 at PageID 1969-70, 1987, 1911).) The ALJ acknowledged that Nurse Lyon-Paul adjusted Plaintiff's medications during this time. (*Id.* (citing AR, Doc. No. 7-10 at PageID 1878).) The ALJ compared this evidence to mental status examinations that generally showed normal

26

findings such as normal or appropriate moods, a normal or full-ranged affect, normal appearance, good eye contact, no abnormal associations, clear and linear thought processes, full orientation, normal fund of knowledge, intact insight and judgment, no memory deficits, a normal attention span, and normal concentration. (*Id.* (citing AR, Doc. No. 7-10 at PageID 1876-77, 1880, 1883, 1903-04, 1918).)

For all of these reasons, the undersigned concludes that the ALJ  adequately addressed the supportability factor pursuant to 20 C.F.R. § 404.1520c(b)(2) and (c)(1).

Plaintiff further contends that the ALJ "failed to account for relevant evidence from [Nurse] Lyon-Paul's own treatment notes that supported the severity of [Plaintiff's] opinions." (SE, Doc. No. 8 at PageID 3142.) This assertion, too, is not well-taken.

Plaintiff argues that the ALJ failed to consider Plaintiff's reports to Nurse Lyon-Paul of subjective symptoms such as social anxiety and panic attacks, and also ignored evidence of Plaintiff's reported anger. (*Id.* at PageID 3143-44.) But as discussed above, the ALJ provided a detailed summary of the mental health treatment notes in the RFC analysis, and acknowledged many subjective complaints that Nurse Lyon-Paul documented—including anxiety, panic attacks, and irritability. (Decision, Doc. No. 7-2 at PageID 55.) The ALJ's discussion of the medical evidence earlier in her decision, in combination with her evaluation of Nurse Lyon-Paul's opinion, included these issues. And as discussed above, the ALJ's conclusions are supported by substantial evidence.

Plaintiff also argues that the ALJ "failed to specifically mention [Nurse] Lyon-Paul's observance of decreased concentration and short-term memory during the September 2020 appointment." (SE, Doc. No. 8 at PageID 3143-44 (citing AR, Doc. No.

27

7-10 at PageID 1870).) But Nurse Lyon-Paul did not *observe* that Plaintiff exhibited such findings during the September 2020 appointment. Instead, Nurse Lyon-Paul listed decreased concentration and short-term memory in the list of *symptoms* that Plaintiff reported. (AR, Doc. No. 7-10 at PageID 1870.) Objectively, Nurse Lyon-Paul indicated in the mental status examination section of the report that she observed "[n]o apparent impairment" in recent or remote memory, and Plaintiff's attention span and concentration were "[w]ithin normal limits." (AR, Doc. No. 7-10 at PageID 1877.) Plaintiff's contention is therefore without merit.

Finally, Plaintiff argues that the ALJ erred when she discounted Nurse Lyon-Paul's absenteeism limitation because she failed to consider that Nurse Lyon-Paul's other opinions could arguably support the limitation. (SE, Doc. No. 8 at PageID 3144-45.) Plaintiff specifically points to Nurse Lyon-Paul's opinions on the form that Plaintiff was seriously limited in the ability to deal with normal work stress and had "problems accepting criticism and interpersonal relationships." (*Id.* at PageID 3145.) However, the ALJ addressed these opinions earlier in her analysis when she explained why she did not adopt "the severity of the limitations noted by [Nurse Lyon-Paul]." (Decision, Doc. No. 7-2 at PageID 61.) As discussed above, the ALJ cited to Plaintiff's reported activities and mental health treatment notes to discount these opinions, and the ALJ's conclusions are supported by substantial evidence. The ALJ was not required to evaluate these opinions again when she discounted Nurse Lyon-Paul's absenteeism limitation.

Moreover, the ALJ is not required to directly address every piece of evidence and finding in the record. *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437

n.11 (6th Cir. 2014). Instead, the ALJ's "factual findings as a whole must show that [she] implicitly resolved" any conflicts in the evidence. *Id.* Here, the ALJ's detailed summary of the mental health records, her comparison of Plaintiff's subjective complaints to the medical and other evidence, and her analysis of the supportability and consistency factors show that the ALJ did, in fact, resolve the conflicts in the evidence when evaluating Nurse Lyon-Paul's opinions. For these reasons, the ALJ's analysis of Nurse Lyon-Paul's opinions is supported by substantial evidence, and the ALJ's decision should be affirmed.

**IT IS THEREFORE RECOMMENDED THAT**:

1.    Plaintiff's Statement of Errors (Doc. No. 8) be OVERRULED;

2.    The Court AFFIRM the Commissioner's non-disability determination; and

3.    The case be terminated on the Court's docket.

*s/ Caroline H. Gentry*
Caroline H. Gentry
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), or (F). Such objections shall

specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).